FILED
IN CLERKS OFFICE

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| Syed K. Rafi, PhD. | ) |
| | ) |
| *Plaintiff* | ) |
| | ) |
| v. | ) Case No. _____ |
| | ) |
| Children's Hospital Boston- | ) |
| Harvard Medical School | ) |
| *Defendants* | ) |

## CIVIL COMPLAINT

### PARTIES IN THIS CIVIL ACTION

1. The defendants in this civil action, Children's Hospital Boston and Harvard Medical School- are located in Suffolk County, Boston, MA.

2. The plaintiff currently resides in Jackson County, Kansas City, MO, and was a resident of Suffolk County, Boston, MA.

### JURISDICTION

Pursuant to U.S. Code, Title 28, part IV, chapter 85, code § 1332 - Diversity of citizenship; amount in controversy; costs- the District Courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, as is determined in this case given the extent of the alleged continuing retaliatory violations in this complaint, and since the litigation is between citizens of different States, wherein, pursuant to Code § 1391-

(1) A civil action may be brought in a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located, as is the case in this litigation; and

(2) A civil action may be brought in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, as is also the case in this litigation;

(3) Jurisdiction also is invoked pursuant to 28 U.S. Code § 1343.

## STATEMENT OF CLAIM

Plaintiff, Syed K. Rafi is an Asian of East Indian heritage, 65 years of age, and a male of Islamic/Muslim faith.    Plaintiff firmly believes that the current and former professional employees of the Children's Hospital Boston (which is an integral part of the  Harvard Medical School), namely, Dr. Mira Irons (current Associate Professor of Pediatrics), in collusion with her colleague, Dr. Barbara Pober (former Associate Professor of Pediatrics) were instrumental in causing ceaseless and reckless coercive retaliation against his professional clinical cytogenetics and related technological job applications, professional medical genetics training applications, medical genetics research applications, and scientific managerial job applications and position, as acts of continuing violations, at all of the Harvard Medical School (HMS)- affiliated hospitals and their federal government funded research establishments: Brigham and Women's Hospital (BWH), Children's Hospital Boston (CHB), Massachusetts General Hospital (MGH), Beth Israel Medical Center, Dona Farber Cancer Institute, as well as at Tufts University Medical Center, Boston, and  around the nation (as ripple effect), ever since Plaintiff had successfully completed his professional- American Board of Medical Genetics (ABMG)- post doctoral clinical cytogenetics training program at Yale School of Medicine (YSM) in 2004. This has resulted in

2

the total loss of his lucrative diagnostic- professional clinical cytogenetics career and loss of income, and consequently, has resulted in irreversible damage to his personal life and psyche.

Plaintiff firmly believes that Dr. Irons, in collusion with her colleague, Dr. Barbara Pober, brought unlawful pressure on Dr. Cynthia Morton and other medical genetics faculty members at the Harvard Medical School(HMS) affiliated Brigham and Woman's Hospital (BWH) in-particular, that has led to the "non-consideration" of each and every one of his more than 3 dozen professional clinical cytogenetics job applications and related technological job applications by Professor Cynthia Morton, and additionally, each and every one his medical genetics research applications by Dr. Richard Maas and by other scientists at BWH.

Plaintiff firmly believes that Dr. Irons has also been directly responsible in denying federal government funded medical genetics- additional training opportunities to Plaintiff while she was serving as the director of the Harvard Medical School-ABMG-medical genetics training program.

In addition, a non-professional- managerial position that Plaintiff had managed to get at the Children's Hospital Boston was also subjected to termination falsely indicating that the service was being terminated, although the service continued to operate after Plaintiff's departure. Plaintiff has anecdotal email evidence indicating the role of Dr. Irons in his dismissal from the managerial position at CHB; Dr. Irons indicated to his managerial position- employer at CHB that Pliantiff should seek a research position at YSM instead (so as to enable her friend and colleague Dr. Pober to be hired back by YSM!).

Plaintiff firmly believes that a genetics research position at the Massachusetts General Hospital(MGH) for which his application was initially entertained by Dr. Marcy MacDonald

3

(*email documentations will be presented as evidence*) soon after Plaintiff's completion of the YSM- ABMG-medical genetics training was later denied consideration consequent to Dr. Pober's research affiliation with Dr. MacDonald, and since then none of Plaintiff's research applications were considered by Dr. MacDonald.

As a ripple effect, this continuing violations at the HMS at large, has also led to the non-consideration of Plaintiff's medical genetics training applications at Tufts Medical Center and around the nation, ever since he successfully completed his professional- American Board of Medical Genetics (ABMG)- post doctoral clinical cytogenetics training program at Yale School of Medicine (YSM) in 2004.

Thus, Plaintiff was subjected to continuing acts of retaliatory- coercive violations since 2004. Consequently, he was not considered even for a single interview in response to any of his more than 5 dozen clinical cytogenetics and medical genetics research job applications at various levels and grades, including professional- American Board of Medical Genetics (ABMG)-molecular genetics training and additional clinical cytogenetics training, as well as applications for medical genetics research since 2004.

To reiterate, all of these alleged "continuing reckless acts of retaliation and coercion" were primarily to compel Plaintiff to seek a position at Yale School of Medicine(YSM) instead of his seeking a position at HMS or elsewhere, so as to facilitate the return of her "displaced" colleague Dr. Pober back to Yale School of Medicine (YSM had also advertised job openings more than 3 times during this period of continued retaliation and coercion, fitting the qualifications of Dr. Pober, the record of which will be presented during the discovery period. Although just at the beginning of last year, Dr. Pober found a job opening at the newly founded Quinnipiac Medical Center instead, which is located adjacent to YSM- New Haven area, it is

4

presumed due to the fact that Plaintiff's job applications at BWH are continued to be ignored to this date, that Dr. Pober is still seeking to be hired back at YSM as Chief of Clinical Genetics (as per the repeated YSM job advertisement over these years), where Dr. Pober's husband, Dr. Jordan Stuart Pober MD, PhD, serves as a tenured Bayer Professor of Translational Medicine; Director, Human and Translational Immunology Program; and as Vice-Chair, Dept. of Immunobiology for the Section of Human and Translational Immunology. Further, Dr. Barbara Pober was shuttling between Boston (HMS) and her residence in the New Haven (YSM) area (Gilford, CT), and thus desperately wanting to go back to YSM, where there was an open position for her, given YSM's stealth arrangement to hire her back after some time **along with Plaintiff, in order to have him as a witness against the dismissed, influential and politically active Middle-Eastern Palestinian professor** and in order to deny the disgruntled dismissed employee a *prima facie* case of discrimination and retaliation, as he had declared in his emails to YSM authorities prior to his termination.

As the email(s) record would indicate (see **Attachment # 3**), several sincere attempts by the Plaintiff over these years to amicably resolve this continuing violations of coercive retaliations- situation, and in order to facilitate the return of Dr. Pober back to YSM, did not yield any amicable resolution due to Dr. Lifton's (YSM) failure to offer Plaintiff a suitable independent faculty position at YSM compensating for his losses and mental agony.

Consequently, Plaintiff had to deviated away from his lucrative professional field of diagnostic clinical cytogenetics, and for the past couple of years has taken-up instead a basic biological research position in the Midwest hiding from the influence of Dr. Irons and Dr. Pober, as well as from Dr. Lifton!

**FOUNDING RATIONALE FOR THE CONTINUING VIOLATIONS:**

**Plaintiff's Written Complaint to Yale School of Medicine (YSM)-**

**Genetics Department Chairman, Dr. Richard Lifton Prior to Departing YSM**

Plaintiff has a documented record of having submitted a written complaint to the Yale University School of Medicine (YSM) Genetics Department Chairman, Dr. Richard Lifton, per Dr. Lifton's demand to do so (**Attachment # 2**). In that report, he has alleged "discriminatory employment practice, retaliation, unfair job offer to a foreigner ignoring more qualified US-citizens, coercion, discrimination in US- federally funded medical genetics training position, exploitation and political activism by Dr. Mazin Qumsiyeh, the Palestinian professor at Dr. Lifton's departmental clinical cytogenetics laboratory.

Therefore Dr. Lifton /YSM initially wanted to use Plaintiff as witness against that Middle Eastern professor, and consequently held back his initial job opportunities at HSM by not providing proper recommendations to enable Dr. Cynthia Morton and others at BWH and MGH, soon after Plaintiff had successfully completed his professional clinical cytogenetics training at the YSM. Plaintiff has anecdotal email evidences to validate this allegation.

As a stealth legal defense strategy, YSM had arranged to simultaneously (but only cosmetically) terminate the position of Dr. Barbara Pober (a Caucasian female), who was serving as a faculty member (Associate Professor) at Dr. Lifton's genetics department as was the Palestinian Arab faculty member (Associate Professor), Dr. Mazin Qumsiyeh, and had planned to hire Dr. Pober back after some time, since her husband happens to be a tenured and influential senior faculty member at YSM.

6

Since Plaintiff had submitted a written complaint against the Middle Easter Arab faculty member at YSM, exclusively due to Dr. Lifton's demand to do so, when Plaintiff needed him to certify the completion of his American Board of Medical Genetics (ABMG) training, and given Plaintiff's religion being Islam/Muslim, and he having submitted the confidential report (see **Attachment # 2**) to Dr. Lifton, fairly incriminating the Palestinian faculty member, Dr. Lifton wanted to hire back Plaintiff in order to facilitate the return of Dr. Pober without any legal challenge by the dismissed disgruntled Middle Eastern Arab professor, given his local, national, and inter-national influence as a leader among the YSM- Arab/Muslim community, and political activism, for which he was primarily stealthily targeted for dismissal, although the Palestinian professor had sent emails to YSM authorities prior to his dismissal indicating that he would legally challenge YSM if he is to be dismissed, indicating that such action would constitute violation of his civil rights and right to free speech.

At the least, the disgruntled Palestinian professor might stage demonstrations at YSM along with his large Middle Eastern Arab student and faculty- supporters at Yale University as a whole, alleging that he was stealthily removed along with the native female faculty member merely to deny him the opportunity *(a prima facie* case of retaliation and racial discrimination) to take legal action against YSM for his dismissal, and he might seek his rehiring as well through legal means, as he is/was: (I) still maintaining his residence in New Haven, CT; (2) still politically active and very influential among the Yale University's Middle Eastern students and faculty; (3) still active in the US Green Party movement; and (4) he is also increasingly well-known and influential at the inter-national arena given his dynamic political activism, as has been only partially indicated below:

See: *qumsiyeh.org/Articles* by Qumsiyeh • Activist Manual ... Qumsiyeh being arrested in Al-Walaja 6 May 2010 and (below) on ... and the list. CONTACT US: **mazinqumsiyeh.org;** *keywikLorg/index.php/Mazin Qumsiyeh ;forusa.org/blogs /frank-kromko wski/mazin-qumsiyeh...peace.../12325 electronicintifada. net/tags/mazin-qumsiyeh mondoweiss.net/author/mazin-qumst:yeh keywiki.org/index. php/MazinQumsiyeh;en.wikipedia.org/wiki/Stereotypes* of Arabs and Muslims in the *Unit...; search the internet for Dr. Qumsiyeh's political activism during 2001- 2002, prior to ending his faculty position at Yale School of Medicine.*

*Also see Dr. Qumsiyeh's current political activism at: http://forusa.org/blogs/frank-kromkowski/mazin-qumsiyeh-awarded-montanas-peace-seeker-year/12325).*

Dr. Qumsiyeh defended his prolific political activism as his First Amendment Right under the US Constitution!

Any such public demonstration or a legal law suit against YSM by the disgruntled dismissed Middle Easter- professor, Dr. Qumsiyeh is sure to damage Yale University's current close financial and educational ties in the Middle East, and affect the sentiments of the large Middle Eastern students and faculty at the Yale campus, given the record of close financial relationship between Yale University and the Middle-Eastern- muslim community and nations, as has been only partially indicated below:

See: Big donations to American colleges from the Muslim world ... *creepingsharia.wordpress.com/../big-donations-towarnerican-collegegro,.;* May 18, 2011 - Yale University received $500,000 from Bahrain this January and Stanford

University received a $149,97 0 gift from Saudi Arabia Universities ... ;    **Schools accept prince's money Yale Daily News** *yaleclailynews.comMiogy2006/0.1/09/schools-accepts-money/* Jan 9, 2006 - Yale was passed over last month when controversial Saudi Prince Alwaleed ... The donations have been accepted by both universities, but the ... ; **Yale Selects Daughter of Global Muslim Brotherhood Leader as ...** *wwwcampus-watchvorWarticlefidA91-14* Aug 24, 2009 - Yale University President Richard C. Levin, said it is extremely useful ... Participants from Saudi Arabia, Turkey, India, China and Russia, will be; *Yale* **Selects Daughter of Global Muslim**

**Brotherhood     Leader     as**     *www.campus-watch.org/article/ic1/8144*     Aug     24, 2009 - According to the report: *Yale University* selected Muna Abu Sulayman, *Yale University* President Richard C. *Levin,* said it is extremely useful to have ... Participants from Saudi *Arabia,* Turkey, India, China and Russia, will be ... ; **Archived-Articles: Why     Did**     *Yale*     **Censor     the     Danish     Cartoons?** *www.americanthinkercom/2009/.../why_dicl_yale_censor_the_danish.ht...* Sep 15, 2009 - *Yale University,* through the Office of the President, Richard *Levin,* ... freely admitted to Klausen that she had frequented Saudi *Arabia).*

It is now abundantly clear understood that YSM through its Genetics Department Chairman, Dr. Richard Lifton had given the promise of hiring back the cosmetically terminated female faculty member from the same division and the department after some time given the fact that her husband is a high ranking influential tenured professor at YSM and her residence is also in the New Haven (YSM) area (Gilford, CT).

In order to accomplish this orchestrated legal defensive and deceptive plan to hire back Dr. Pober, YSM had planned to use Plaintiff as a defensive witness against the terminated former YSM- Middle Eastern faculty member, since he had submitted a confidential report against that Middle Eastern Palestinian faculty member prior to his termination. However, in his confidential report, Plaintiff had binding statements against using his confidential report for any legal defense purpose (see **Attachment # 2**). Therefore, hiring back the Plaintiff along with Dr. Pober become essential for the legally safe and non-controversial return of Dr. Pober to safe-guard Yale's reputation, and Plaintiff's decision, as he had indicated in his confidential report to Dr. Lifton (see Attachment 2) led to the continuing coercive retaliations against the Plaintiff, costing total loss of his lucrative clinical cytogenetics career to this date, and the income as well as irreversible losses to his personal life, psyche, and the loss of civil liberties that are guaranteed by the US constitution.

# CIVIL RIGHTS LAWS THAT LEGITIMIZE PLAINTIFF'S *PRIMA FACIE* CASE OF CONTINUING RETALIATION:

## *I.    PRIMA FACIE* CASE OF RETALIATION UNDER TITLE *VII OF THE CIVIL RIGHTS ACT OF 1964*

*Title VII of the Civil Rights Act of 1964 explicitly prohibits an employer from retaliating against an employee who has "made a charge, testified, assisted or participated in" any charge of unlawful discrimination under the Act.*

*Title VII of the Civil Rights Act of 1964 explicitly prohibits an employer from retaliating against an employee who has "made a charge, testified, assisted or participated in" any charge of unlawful discrimination under the Act (42 U.S.C. § 2000e-3(a).*

*Title VII of the Civil Rights Act of 1964 (Pub. L. 88-352) (Title VII), as amended, as it appears in volume 42 of the United States Code, beginning at section 2000e, strictly and explicitly prohibits employment discrimination based on race, color, religion, sex and national origin. The Civil Rights Act of 1991 (Pub. L. 102-166) (CRA) amends several sections of Title VII, and In addition, section 102 of the CRA amends the Revised Statutes by adding a new section following section 1977 (42 U.S.C. 1981), to provide for the recovery of compensatory and punitive damages in cases of intentional violations of Title VII.*

*To prove retaliation, a complainant has to show, among other elements, that he or she suffered an "adverse employment action."*

*Until recently, federal courts were split as to the definition of that term. Some courts held, for example, that it had to be an "ultimate employment decision" such as hiring, terminating, promoting or compensating, while others held that it was any "materially adverse change in the terms and conditions of employment," such as suspension without pay or demotion. (See Mattern v. Eastman Kodak Co., 104 F.3d 702, 707 (5th Cir. 1997); and See, e.g., Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir. 1999) (noting that "[a] materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation).*

*On June 22, 2006, the United States Supreme Court resolved this split, issuing a decision which expands the rights of employees under Title VII. In Burlington Northern Santa Fe Railroad Co. v. White,4 the Court held that an employer's actions will be considered an adverse employment action if the conduct "would have been materially adverse to a reasonable employee or job applicant," and the action could "dissuade a reasonable worker from making or supporting a charge of discrimination." In addition, the Court expanded the scope of the definition of "adverse employment action" by stating that it "extends beyond workplace-related or employment-related retaliatory acts and harms." This expansive definition, therefore, could include things that occur beyond everyday interactions in the office, such as vandalism, refusing*

*to provide post-employment information (such as references), or continually calling or driving by an employee's home for intimidation purposes.*

*Recently, the first Circuit Allowed Retaliation Claim to Proceed Absent Direct Evidence of Decision Makers' Retaliatory Animus (See, Travers v. Flight Services & Systems, Inc., No. 13-1438 (1st Cir. Dec. 12, 2013); and in Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee, No. 06-1595, U.S. Supreme Court (January 26, 2009), Justices Hold Employee Response During An Internal Investigation Is "Protected Activity".*

## II.    *PRIMA FACIE* CASE OF RETALIATION UNDER TITLE VI

*Additionally, a complainant may bring a retaliation claim under Title VI or under a Title VI regulation that prohibits retaliation. For example, most agency Title VI regulations provide that "[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [Title VI], or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subpart." 28 C.F.R. § 42.108(e) (Department of Justice- Regulation).*

## 28 CFR § 42.108 Procedure for effecting compliance:

*__General.__ If there appears to be a failure or threatened failure to comply with this subpart and if the noncompliance or threatened noncompliance cannot be corrected by informal means, the responsible Department official may suspend or terminate, or refuse to grant or continue, Federal financial assistance, or use any other means authorized by law, to induce compliance with this subpart. Such other means include, but are not limited to:*

*(1) Appropriate proceedings brought by the Department to enforce any rights of the United States under any law of the United States (including other titles of the Act), or any assurance or other contractual undertaking, and*

*(2) Any applicable proceeding under State or local law.*

12

***Non-compliance with assurance requirement.*** *If an applicant or recipient fails or refuses to furnish an assurance required under § 42.105, or fails or refuses to comply with the provisions of the assurance it has furnished, or otherwise fails or refuses to comply with any requirement imposed by or pursuant to title VI or this subpart,* ***Federal financial assistance may be suspended, terminated, or refused in accordance with the procedures of title VI and this subpart.*** *The Department shall not be required to provide assistance in such a case during the pendency of administrative proceedings under this subpart, except that the Department will continue assistance during the pendency of such proceedings whenever such assistance is due and payable pursuant to a final commitment made or an application finally approved prior to the effective date of this subpart.*

***Termination of or refusal to grant or to continue Federal financial assistance.*** *No order suspending, terminating, or refusing to grant or continue Federal financial assistance shall become effective until:*

*(1) The responsible Department official has advised the applicant or recipient of his failure to comply and has determined that compliance cannot be secured by voluntary means,*

*(2) There has been an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to comply with a requirement imposed by or pursuant to this subpart,*

*(3) The action has been approved by the Attorney General pursuant to § 42.110, and*

*(4) The expiration of 30 days after the Attorney General has filed with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action.*

*Any action to suspend or terminate or to refuse to grant or to continue Federal financial assistance shall be limited to the particular political entity, or part thereof, or other applicant or recipient as to whom such a finding has been made and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found.*

13

**Other means authorized by law.** *No action to effect compliance by any other means authorized by law shall be taken until:*

*(1) The responsible Department official has determined that compliance cannot be secured by voluntary means,*

*(2) The action has been approved by the Attorney General, and*

*(3) The recipient or other person has been notified of its failure to comply and of the action to be taken to effect compliance.*

### Regulation 28 C.F.R. § 35.134 & § 36.206— Retaliation Or Coercion:

*No private or public entity shall discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual <u>made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act or this part.</u>*

*No private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part.*

*<u>Retaliating against any person because that person has participated in any investigation or action to enforce the Act or this part is prohibited !!!</u>*

### Regulation 29 C.F.R. § 1630.12; And  42 U.S. Code § 12203 –

### Retaliation Or Coercion:

*<u>Retaliation</u> - It is unlawful to discriminate against any individual because that individual has opposed any act or practice made unlawful by this part or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing to enforce any provision contained in this part.*

*There are three main terms that are used to describe retaliation. Retaliation occurs when an employer, employment agency, or labor organization takes an adverse action against a covered individual because he or she engaged in a protected activity. These three terms are described below.*

*An adverse action is an action taken to try to keep someone from opposing a discriminatory practice, or from participating in an employment discrimination proceeding. Examples of adverse actions include:*

• *employment actions such as termination, refusal to hire, and denial of promotion,*

• *other actions affecting employment such as threats, unjustified negative evaluations, unjustified negative references, or increased surveillance.*

*Retaliatory adverse actions are unlawful even if the prior protected activity alleged wrongdoing by a different employer, retaliatory adverse actions are unlawful. For example, it is unlawful for a worker's current employer to retaliate against him for pursuing an EEO charge against a former employer!!!*

*(a)    Prohibition of Retaliation:*

*No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.*

*(b)   Prohibition of Interference, coercion, or intimidation:*

*It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.*

15

## III.   *PRIMA FACIE* CASE OF RETALIATION UNDER TITLE VI *AND TITLE IX* *SUPPORT A PRIVATE RIGHT OF ACTION AGAINST RETALIATION BASED ON ALLEGATIONS OF "INTENTIONAL DISCRIMINATION"*

Furthermore, the Core Antidiscrimination Principles in Recipients of federal aid, <u>such as the Children's Hospital Boston and the Harvard Medical School in this allegation,</u> have voluntarily accepted financial assistance exchange for accepting the conditions of Title VI or Title IX's regulations, including regulations prohibiting retaliation.

*Both Title VI and Title IX Support a Private Right of Action Against Retaliation Based on Allegations of "Intentional Discrimination":*

*Even to the extent that courts should construe Title VI or Title IX in light of Title VII, there is a strong argument in favor of implied rights of action against retaliation.*

*Title VI reaches private actors who are recipients of federal funds   (Pamela S. Karlen, Disarming the Private Attorney General, 2003 U. ILL. L. REV. 183, 196 n.83 (2003).*

*In its Title VI Manual, the Department of Justice ("DOJ") provides helpful definitions of the terms "recipient" and "beneficiary."*

*A complainant may bring a retaliation claim under Title VI or under a Title VI regulation that prohibits retaliation. For example, most agency Title VI regulations provide that "[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [Title VI], or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subpart." 28 C.F.R. § 42.108(e) (Department of Justice Regulation).*

### (a).   *U.S. Supreme Court Holds that Section 1981 Covers Retaliation Claims:*

*The U.S. Supreme Court agreed with the Seventh Circuit that section 1981 covers retaliation claims, including a retaliation claim based on one individual's concern for another's section 1981 rights. The Court's reasoning as follows: (a) in 1969, the Court's decision in*

16

*Sullivan v. Little Hunting Park, Inc., 396 U.S. 299 (1969), recognized that section 1981's sister statute, 42 U.S.C § 1982, included retaliation claims; (b) the Court has long interpreted sections 1981 and 1982 alike; (3) in Patterson v. McLean Credit Union, 491 U.S. 164 (1989), the Court, without mention of retaliation, narrowed the scope of section 1981 by excluding post-contract-formation conduct, where retaliation would most likely be found; but subsequently, Congress passed the Civil Rights Action of 1991, which superseded Patterson and explicitly defined the scope of section 1981 to include post-contract-formation conduct; and (4) since 1991, the lower courts have uniformly interpreted section 1981 as encompassing retaliation actions.*

## *(b). Additionally, Sullivan and Its Progeny Imply a Private Right of Action Against Retaliation:*

*The Supreme Court has consistently treated retaliation against civil rights complainants as a form of intentional discrimination. The Court has held that "retaliation offends the Constitution [because] it threatens to inhibit exercise of the protected right" and "is thus akin to an unconstitutional condition demanded for the receipt of a government-provided benefit."*

*Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1998) (citations and internal quotation marks omitted); see also Chandamuri v. Georgetown Univ., 274 F. Supp. 2d 71, 81 (D.D.C. 2003) (discussing Court's approach to retaliation in Crawford-El).*

*Specifically, the Court has interpreted 42 U.S.C. §§ 1982 and 1983 to bar retaliation against complainants or litigants even though these statutes do not contain explicit prohibitions against retaliation. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 277-87 1977). In 1969, the Supreme Court in Sullivan v. Little Hunting Park, held that § 1982 implicitly prohibits retaliation.*

### ESTABLISHING A *PRIMA FACIE* CASE OF RETALIATION

To establish a prima facie case of retaliation, the investigating agency must first determine if the complainant can show (1) that he or she engaged in a protected activity, (2) that

the recipient knew of the complainant's protected activity, (3) that the recipient took some sort of adverse action against the complainant, and (4) that there was a causal connection between the complainant's protected activity and the recipient's adverse actions. See Davis v. Halpern, 768 F.Supp. 968, 985 (E.D.N.Y. 1991). (Defendant's summary judgment motion to dismiss Title VI retaliation claim was denied because he established evidence of prima facie case).

**Accordingly, Plaintiff in this case shows that:** (1) he engaged in constitutionally protected activities indicating job discriminations at Yale School of Medicine; (2) there is a logical connection between the protected activity, and the YSM- Genetics Department Chairman, Dr. Lifton not only received Plaintiff's YSM complaint of job discrimination and federal training grant abuse at his own department (see the attached YSM confidential complaint), and additionally, Dr. Lifton and all of the accused HMS- professors, such as Dr. Pober, Dr. Irons, Dr. Morton, and Dr. Maas, and others at HMS are in close contact with each other academically, as they all practice medical genetics, and Dr. Pober and Dr. Lifton were at HMS prior to moving to YSM; , and are also continuous recipients of NIH-Federal Govt. grant awards totaling several millions of dollars every year (data freely available from the NIH-grants website!), (3) the recipients took Continuing acts of adverse action against Plaintiff for a prolonged period of time in an continuing manner **as an act of continuing retaliation and coercion** by not considering any of his more than 5 dozen job applications at every level and grade,and (4) there is/ was a causal connection between Plaintiff's protected activity and the recipient's continuing adverse actions. *See Davis v. Halpern, 768 F.Supp. 968, 985 (E.D.N.Y. 1991). (Defendants's summary judgment motion to dismiss Title VI retaliation claim was denied because he established evidence of prima facie case!).*

Once a prima facie case of retaliation has been established, the investigating agency must then determine if the recipient can articulate a "legitimate non-discriminatory reason" for the action. Id. If the recipient can offer such a reason, the investigating agency must then show that recipient's proffered reason is pre-textual and that the recipient's actual reason was retaliation. Id. A showing of pretext is sufficient to support an inference of retaliation. Id.

Given the continuing and reckless acts of alleged retaliation involving more than 5 dozen job applications at various grades/levels for a prolonged period of time at BWH (HMS) alone, in addition to numerous job applications within the other HMS-affiliated CHB, MGH, and other hospitals and around the country, it is relatively easy to show that recipient's proffered reason is pre-textual and that the recipient's actual reason was indeed retaliation. *Id. A showing of pretext is sufficient to support an inference of retaliation. Id.*

## CONTINUING VIOLATIONS DOCTRINE

The continuing violation doctrine permits a complainant to pursue alleged discriminatory acts that occurred outside the statutory period under Title VII. **United States Supreme Court does recognize systemic violations, which involve the continuing policy or practice of discrimination on a company-wide basis, which policy or practice continues into the statutory period, as is alleged in this complaint.** Further, *in National Railroad Passenger Corp. (Amtrak) v. Morgan,* 536 U.S. 101,122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002), the Supreme Court also left unresolved the issue of whether the continuing violation doctrine applies to systemic violations. However, ccontinuing violation doctrine been accepted, to varying degrees, in employment litigations. The Ninth Circuit permitted to recover for acts outside the limitations period as long as the acts represented an ongoing unlawful employment practice. *See,*

19

*e.g., Anderson v. Reno,* 190 F.3d 930, 936 (9th Cir. 1999). The Supreme Court affirmed the Ninth Circuit in part, reversed in part and remanded the matter. The Supreme Court defined the issue before it as "whether, and under what circumstances, a Title VII complainant may file suit on events that fall outside [the] statutory time period."

The Court held that a hostile environment claim generally does not occur on any given day, but rather occurs over a number of days or even years and is based on the cumulative effects of several acts. For that reason, the Court ruled that as long as one act contributing to the hostile environment claim occurs within the statutory period, a Title VII complainant may recover for the entire period of that hostile environment.

Accordingly, Plaintiff Invokes the Continuing Violations Doctrine / Continuing Claims Doctrine in his allegations of prolonged coercive ceaseless and reckless retaliatory violations by Dr. Irons (on behalf of Dr. Pober), and by Dr. Morton due to the influence peddling by Dr. Irons on behalf of Dr. Pober and by Dr. Lifton (YSM), in accordance with the Continuing Violations Doctrine as defined by the U.S. Supreme Court in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

**Accordingly, Plaintiff filed a complaint of continuing retaliation and coercion with the United States Equal Employment Opportunity Commission (EEOC) in Boston, MA, and the EEOC issued the letter of "Right to Sue" within 90 days period after the receipt of the letter by Plaintiff, and accordingly, this civil complaint is being filed (see Attachment # 1).**

**REQUEST FOR RELIEF**

Plaintiff seeks relief in accordance with the laws and provisions cited below under the Remedies and Procedures, taking into consideration the continuing nature of the alleged reckless and ceaseless violations, as acts of continuing nature which falls under the "Continuing Violations Doctrine" for such a prolonged period of time, which has totally paralyzed Plaintiff's professional career, and has also irreversibly affected his personal life.

**REMEDIES AND PROCEDURES**

The EEOC takes the position that all anti-discrimination laws provide for compensatory as well as punitive damages for "illegal retaliation".

Whenever discrimination is found, the goal of the law is to put the victim of discrimination in the same position (or nearly the same) that he or she would have been if the discrimination had never occurred (EEOC).

Additionally, the US Supreme Court has observed that it will recognize whatever remedies are necessary to effectuate a statutory right, because "the existence of a statutory right implies the existence of all necessary and appropriate remedies." Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 69 (1992) (quoting Carey Piphus, 435 U.S. 247, 255 (1978)); see also Chandamuri, 274 F. Supp. 2d at 81 discussing Supreme Court's Franklin decision as supporting view that courts should provide remedies in retaliation cases. The types of relief will depend upon the discriminatory action and the effect it had on the victim (EEOC).

Accordingly, Plaintiff requests the Court to compensate him for the emotional harm that he has suffered (such as mental anguish, inconvenience, or loss of the liberty and enjoyment of life), during this prolonged reckless retaliation and coercion by the Children's Hospital Boston

faculty members, Dr. Irons and Dr. Pober, the Children's Hospital Boston, and the Harvard Medical School.

**WHEREFORE, the Plaintiff demands jury trail and judgment against the defendants for damages and such other relief as the Court deems just.**

**Respectfully submitted.**

Date: _Oct. 30th 2014_          Signature: _K. Syed Rafi_

                               Name:     Syed K. Rafi

                               Address:  P.O. Box # 32302,
                                         Kansas City, MO. 64171.
                               Email:    rafigene@yahoo.com


## DECLARATION UNDER PENALTY OF PERJURY

I undersigned declares under penalty of perjury that Syed K. Rafi is the plaintiff in the above action, that he has read the above complaint and that the information contained in the complaint is true and correct. 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Executed at ___Kansas City, MO. 64171___ on ___Oct. 30th, 2014___
              (Location)                        (Date)

_____K. Syed Rafi_____
                            **Plaintiff's Original Signature**